Devlin BURKE, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2014–SC–000472–DG

Supreme Court of Kentucky.

DECEMBER 15, 2016

COUNSEL FOR APPELLANT: Kathleen Kallaher Schmidt, Department of Public Advocacy

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Jeffrey Allan Cross, Assistant Attorney General

## OPINION OF THE COURT BY JUSTICE KELLER

A Kenton County jury convicted Devlin Burke of three counts of second degree assault, one count of fourth degree assault, and being a persistent felony offender in the second degree. The jury recommended a sentence of seventeen-years' imprisonment. Following trial, the court imposed

the recommended sentence and made a finding that Burke's actions constituted a hate crime under Kentucky Revised Statute (KRS) 532.031. Burke appealed his conviction to the Court of Appeals, arguing that KRS 532.031 is unconstitutional as written and as applied. He also argued that the trial court made a number of errors regarding the admission and exclusion of evidence and in instructing the jury. Although it found some errors occurred, the Court of Appeals affirmed. We granted discretionary review in order to address the issues raised by Burke, in particular, his argument that KRS 532.031 is unconstitutional. Having reviewed the record, we affirm Burke's convictions, although for somewhat different reasons than the Court of Appeals. However, we reverse the trial court's designation of Burke's second-degree assaults as hate crimes and remand for entry of a judgment consistent with this opinion.

## I. BACKGROUND.

The following is essentially undisputed. At approximately 1:00 a.m. on August 15, 2010, Burke, Erica Abney, Pam Keller, Tim Searp, and Charles Clark were sitting in Clark's car, which was parked in a gas station parking lot. Katie Meyer, Dee Sprague, Ondine Quinn, Connie Kohlman, and several others were walking across the gas station parking lot as they travelled from one neighborhood bar to another. As Sprague and Quinn passed behind Clark's car, Clark, who did not see them, began to back out of his parking space. Quinn hit the trunk of Clark's car twice and Sprague said, "Whoa, whoa, we're here. Wait." Keller and Abney began yelling at Quinn and Sprague from inside the car, and eventually everyone got out of the car. Keller and Abney confronted Quinn and Sprague while yelling sexually derogatory remarks at them. Searp ran after Kohlman, who was ahead of Quinn and Sprague, and he

hit her, pushed her head against a wall, knocked her to the ground, and kicked her. Although Burke denied doing so, Meyer testified that she saw Burke kicking Kohlman and that Burke kicked her when she tried to protect Kohlman. Meyer also testified that, during this confrontation, Burke yelled, "fucking dykes" and "clit lickers," based on his apparent perception of the women's sexual orientation.

At some point a crowd gathered across the street from the gas station and a van pulled into the gas station parking lot. Although the timing is unclear from the witnesses' testimony, Burke, who by then had pulled out a knife, stabbed one of the men in the crowd, Christopher Pfeiffer, in the neck. The driver of the van, James Patton, and at least one of his passengers, Justin Sizemore, got out of the van and confronted Burke, who sliced Patton across the stomach. Burke also cut another passenger who was getting out of the van, Preston Akemon. The police arrived shortly thereafter and arrested Searp, Abney, and Burke.

Burke's defense was two-fold: he did not attack Kohlman or Meyer; and he was acting in self-defense when he stabbed Pfeiffer, Patton, and Akemon. In support of the first defense, Burke offered Searp's testimony that it was he who attacked Kohlman; that he never saw Meyer; and that Burke was not involved in that part of the altercation. As to self-defense, Burke testified that, when Keller and Abney got out of the car, he tried to get them to calm down and return to the car. He denied hitting Kohlman or Meyer and stated that Pfieffer and another man from the crowd came at him and wanted to fight. Burke testified that he began backing away from those two when he was confronted by Patton, who was armed with a hammer, Akemon, who was armed with a knife, and Sizemore. At that point, Pfieffer tackled

Burke, and Burke stabbed Pfieffer in the neck to get away from him. Burke then stabbed Akemon and Patton as he made his way back to Clark's car. When he heard sirens, Burke threw away the knife and got in the car.

Based on the preceding, the jury convicted Burke of the crimes delineated above. We set forth additional facts as necessary below.

## II. STANDARD OF REVIEW.

The various issues raised by Burke require us to apply different standards of review. Therefore, we set forth the appropriate standard as we address each issue.

## III. ANALYSIS.

### A. KRS 532.031 is constitutional as written and as applied to Burke.

#### 1. As written.

Burke raises a number of issues regarding the constitutionality of KRS 532.031, Kentucky's "hate crimes" statute. Burke properly preserved the issues, which we review *de novo. Greene v. Commonwealth*, 349 S.W.3d 892, 898 (Ky. 2011). In applying that standard, we presume that the General Assembly did not intend for this statute to be unconstitutional. *Rice v. Commonwealth*, 492 S.W.3d 563 (Ky. 2016).

At the outset, we note that KRS 532.031 provides, in pertinent part, as follows:

(1) A person may be found by the sentencing judge to have committed an offense specified below as a result of a hate crime if the person intentionally because of race, color, religion, sexual orientation, or national origin of another individual or group of individuals violates a provision of any one (1) of the following:

. . .

(a) KRS 508.020 [assault in the second degree], . . . or 508.030 [assault in the fourth degree];

(2) At sentencing, the sentencing judge shall determine if, by a preponderance of the evidence presented at the trial, a hate crime was a primary factor in the commission of the crime by the defendant. If so, the judge shall make a written finding of fact and enter that in the court record and in the judgment rendered against the defendant.

(3) The finding that a hate crime was a primary factor in the commission of the crime by the defendant may be utilized by the sentencing judge as the sole factor for denial of probation, shock probation, conditional discharge, or other form of nonimposition of a sentence of incarceration.

(4) The finding by the sentencing judge that a hate crime was a primary factor in the commission of the crime by the defendant may be utilized by the Parole Board in delaying or denying parole to a defendant.

KRS 532.031 is entitled "Hate crimes; finding; effect," and is commonly, if inaptly, referred to as the "hate crimes statute." A " '[c]rime' [is] a misdemeanor or a felony." KRS 500.080(2). A " '[m]isdemeanor' [is] an offense, other than a traffic infraction, for which a sentence to a term of imprisonment of not more than twelve (12) months can be imposed." KRS 500.080(10). And a " '[f]elony' [is] an offense for which a sentence to a term of imprisonment of at least one (1) year in the custody of the Department of Corrections may be imposed." KRS 500.080(5). Thus, KRS 532.031, despite its title, does not create a crime because it does not impose any term of imprisonment.

All KRS 532.031 does is: (1) permit the trial court to use the designation of a hate crime as the sole basis to deny probation

or some other form of conditional discharge; and (2) permit the Parole Board to consider that designation when delaying or denying parole. However, the statute does not mandate the use of the designation of a hate crime in either instance, it simply permits its use; and the designation is but one of several factors a court can consider when denying probation[1] and the Parole Board can consider in delaying or denying parole.[2] *See* KRS 533.010 and KRS 439.340. Thus, while KRS 532.031 may have some impact on how much time a defendant ultimately serves, it has no impact on the length of a defendant's sentence. Burke's reliance on opinions analyzing the persistent felony offender and death penalty statutes is therefore misplaced because the opinions in those cases address statutory provisions that directly affect the sentence imposed. And, as noted above, KRS 532.031 has no impact on sentences.

Likewise, Burke's reliance on cases addressing KRS 439.340, which provides that certain offenders must serve 85% of a sentence before parole eligibility, is misplaced, because those cases deal with a mandate regarding parole eligibility. Again, as noted above, KRS 532.031 does not mandate the amount of time that must be served prior to parole eligibility. It simply states that the designation <u>may</u> be used to deny parole.

. ▮▮▮ As to the constitutionality of KRS 532.031, we note that "[p]arole is a privilege and its denial has no constitutional implications." *Stewart v. Commonwealth*, 153 S.W.3d 789, 793 (Ky. 2005). Likewise, probation is not a right but "a privilege or a 'species of grace extended to a convicted criminal' for his welfare and the welfare of organized society." *Ridley v. Commonwealth*, 287 S.W.2d 156, 158 (Ky. 1956) (citing *Darden v. Commonwealth*, 277 Ky. 75, 125 S.W.2d 1031, 1033 (1939)). The granting of parole is wholly at the discretion of the Parole Board and the granting of probation is wholly within the discretion of the trial court. *See Stewart*, 153 S.W.3d at 793, *and Ridley*, 287 S.W.2d at 158. Therefore, because KRS 532.031 mandates nothing and has no impact on any constitutionally protected right, we discern no constitutional infirmity in the statute as written.

### 2. As applied.

Burke makes several inter-related arguments with regard to the constitutionality

---

1. KRS 533.010 provides in pertinent part that, before denying probation, a court should: "consider probation, probation with an alternative sentencing plan, or conditional discharge. Unless the defendant is a violent felon as defined in KRS 439.340 or a statute prohibits probation, shock probation, or conditional discharge, after due consideration of the defendant's risk and needs assessment, nature and circumstances of the crime, and the history, character, and condition of the defendant, probation or conditional discharge shall be granted, unless the court is of the opinion that imprisonment is necessary for protection of the public because: (a) There is substantial risk that during a period of probation or conditional discharge the defendant will commit another crime; (b) The defendant is in need of correctional treatment that can

be provided most effectively by his commitment to a correctional institution; or (c) A disposition under this chapter will unduly depreciate the seriousness of the defendant's crime."

2. When addressing entitlement to parole, the Parole Board shall consider: "the results of [a prisoner's] most recent risk and needs assessment, his or her criminal record, his or her conduct, employment, and the reports of physical and mental examinations that have been made ... [as well as] the circumstances of his or her offense, the results of his or her most recent risk and needs assessment, and his or her previous social history to the board."

of KRS 532.031 as applied. We address each separately, to the extent possible.

### a. Entitlement to pre-trial notice.

■ Burke argues that he was entitled to pre-trial notice that the Commonwealth would seek hate-crime designation because the designation affected his ability to obtain parole. Furthermore, he argues that, with notice, he would have altered his trial strategy. There are four problems with Burke's arguments. First, the statute neither provides for nor mandates pre-trial notice. Second, there is no evidence in the record that Burke has been denied parole or that parole has been delayed, let alone that any such denial or delay was the result of the hate-crime designation.

■ Third, the trial court only has to find by a preponderance of the evidence that a crime should be designated a hate crime. Although we do not have any case law directly on point, in the context of determining eligibility for parole for an incarcerated person claiming to be a domestic violence victim, the standard is whether "the defendant was more likely than not to have been" such a victim. *Commonwealth v. Anderson*, 934 S.W.2d 276, 278 (Ky. 1996). Applying that standard here, we note that the Commonwealth put on evidence that Burke made a number of statements toward the women disparaging what he perceived to be their sexual orientation. Furthermore, during his interview with the police, Burke stated that at least one of the women looked "dude-ish." Burke denied making any disparaging comments, and Clark and Searp testified that they did not hear Burke make any such comments. Burke argues that, given sufficient notice, he would have put on evidence about the relationships of the various women and more evidence about his motives. Assuming that evidence of the relationships of the various women would have been admissible, as noted below, it was not relevant to the hate-crime designation. Furthermore, Burke put on evidence about his motive—he acted in self-defense because he was in fear for his life—and evidence of any other motivation would have been inconsistent with his claim of self-defense. Burke has not established that any of the evidence he now suggests he would have produced would have negated the Commonwealth's evidence and decreased the likelihood that his offense constituted a hate crime.

Fourth, we note that Burke argues that he would have made different objections regarding the admission of certain evidence if he had received notice of a possible hate-crime designation. However, he did object to some of the evidence he deemed harmful, and he has not shown how asserting different grounds for his objections would have changed the court's evidentiary rulings.

### b. Entitlement to a jury finding.

■ Burke argues that he was entitled to a finding by the jury that he committed a hate crime. However, as noted above, although KRS 532.031 is commonly referred to as the hate-crime statute, it does not actually create a crime. It has no impact on the length of sentence and only impacts entitlement to probation and parole, matters that are not within the purview of the jury. Therefore, we discern no infirmity in the statute's provision for a finding by the court rather than the jury.

### c. Evidence regarding the designation's impact on parole eligibility.

■ As Burke notes, "It is recognized policy, in furtherance of justice, to provide full and accurate information to a sentencing jury." *Offutt v. Commonwealth*, 799 S.W.2d 815, 817 (Ky. 1990). Burke argues that because the jury was not told during the penalty phase about the poten-

tial impact a hate-crime designation could have, it received a "skewed picture of parole." There are five problems with Burke's argument. First, a hate-crime designation is not made until after the jury recommends a sentence. Second, although juries are informed about the mandatory minimum and maximum sentences, parole eligibility, and factors that may impact parole eligibility, they are not informed about every factor that the Parole Board is entitled to consider. Third, KRS 532.055, the "truth in sentencing statute," lists evidence that the Commonwealth "may" offer, not evidence that it must offer. Thus, there is no statutory mandate that the Commonwealth advise the jury regarding the impact of a hate-crime designation. Fourth, the cases to which Burke refers are not persuasive as they involve: failure to properly instruct the jury (*Offutt v. Commonwealth*, 799 S.W.2d 815, 815 (Ky. 1990)); incorrect or false testimony about the impact of good time credit (*Robinson v. Commonwealth*, 181 S.W.3d 30, 38 (Ky. 2005), *as modified on denial of reh'g* (Jan. 19, 2006)); failure to instruct as to the proper maximum sentence (*Lawson v. Commonwealth*, 85 S.W.3d 571, 582 (Ky. 2002)); and improperly classifying a defendant as a violent offender (*Floyd v. Commonwealth*, 2007–SC–000291–MR, 2009 WL 736002 (Ky. Mar. 19, 2009)). Fifth, as noted by the Court of Appeals and the Commonwealth, nothing prevented Burke from presenting evidence regarding the hate-crime designation and its possible impact on parole. For the foregoing reasons, we discern no merit to Burke's argument that it was error for the jury not to have such evidence.

### d. Adequacy of proof.

Although somewhat inartfully worded, KRS 532.023 states that an assault can be designated a hate crime if the assault was intentionally committed, "because of race,

color, religion, sexual orientation, or national origin." In making that designation, the trial court must find, by a preponderance of the evidence, that "a hate crime" was the "primary motivating factor" in the assault. Thus, the trial court was required to find by a preponderance of the evidence that Burke assaulted Meyer, Pfeiffer, Patton, and Akemon because of their sexual orientation and that their sexual orientation was a primary motivating factor for the assaults.

Burke correctly notes that there is no evidence regarding the sexual orientation of any of the victims, which he believes is fatal to designating any of the assaults as hate crimes. He also argues that there was insufficient evidence to establish that he was primarily motivated by the victims' sexual orientation or that the assaults were "because of" that orientation. We disagree, in part.

As to proof of the victims' sexual orientation, we agree with the Court of Appeals that proof a victim falls within a protected category puts the emphasis on the victim rather than on the perpetrator. It is the perception of the perpetrator and his motivation that is at issue, not the actual status of the victim. If a man, who is dancing a jig while wearing a kilt and a tee-shirt that says, "Kiss me I'm Irish," is attacked by someone shouting, "I hate all the Irish," whether the victim is Irish or German is immaterial under KRS 532.023. Likewise, if a man attacks a woman while saying, "fucking dykes" and "clit lickers," the woman's actual sexual orientation is immaterial.

As to the adequacy of the evidence, the trial court found:

[Burke], after getting out of the car, made a derogatory statement about the sexual orientation of the women and ... assaulted a woman in the group.... The assault by [Burke] and [Searp] as well

as the argument between the female passenger and another woman in the walking group caused several groups of individuals to stop and attempt to break up the situation. [Burke] then cut three men who arrived on the scene to assist. The facts demonstrate that [Burke] intentionally left the vehicle to assault women he believed to be lesbians. All his other actions including all of the assaults stem from his intention to harm a person because of their sexual orientation. Based on these trial facts, the court finds by a preponderance of the evidence that a hate crime was the primary factor in the commission of the Assault [against Meyer] and the three Assaults [against Pfeiffer, Patton, and Akemon].

 Burke argues that the evidence did not support a finding that he assaulted any of the four individuals "because of" their sexual orientation. According to Burke, the term "because of" in the statute means "but for" and the evidence does not support a finding that "but for" the victims' sexual orientation the assaults would not have occurred. The Commonwealth argues that use of the term "primary factor" in paragraphs (2), (3), and (4) of the statute means that sexual orientation only has to be the main factor for the assaults, not the sole factor. Before we can address the adequacy of the evidence, we must address whether the trial court was required to find that sexual orientation was the sole factor for the assaults or only the primary or main factor. We hold that it is the latter.

 "In construing statutes, our goal is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration." *Osborne v. Common-*

*wealth*, 185 S.W.3d 645 (Ky. 2006). "We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes." *Rice v. Commonwealth*, 492 S.W.3d 563, 564 (Ky. 2016)(quoting, *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011)).

As set forth above, the General Assembly provided in paragraph (1) of the statute that a sentencing judge "may" designate a crime as a hate crime if the underlying crime was committed "because of" a number of listed factors. In paragraph (2), the General Assembly provided that, when designating a crime as a hate crime, the sentencing judge "shall determine if, by a preponderance of the evidence presented at the trial, a hate crime was a primary factor in the commission of the crime by the defendant." Giving meaning to all parts of the statute, it is clear to us that the General Assembly intended "because of" and "primary factor" to be read in conjunction. Thus, in this case, the trial court could only designate the assaults as hate crimes if they were committed because of the victims' sexual orientations, with sexual orientation being the primary factor, but not the only factor, for the assaults.

 Applying the preceding to the four assaults, we agree with the trial court and the Court of Appeals that there was sufficient evidence that the primary factor for Burke's assault of Meyer was his perception of her sexual orientation. The court heard evidence that, before assaulting Meyer, Burke made disparaging comments about the women's sexuality. That was sufficient to prove by a preponderance of the evidence that Burke's perception of Meyer's sexuality was a primary factor in his assaulting her.

However, we disagree with the trial court and the Court of Appeals that there was sufficient evidence to support a designation of the other three assaults as hate crimes. There is no evidence that Burke was motivated to assault Pfeiffer, Patton, or Akemon because of their sexual orientation or because of any of the other factors in KRS 532.023. Those assaults followed Burke's assault of Meyer and were part of the same melee but that nexus is not sufficient to garner designation as a hate crime. That designation requires proof that one of the KRS 532.023 categories was a "primary factor" for those three assaults, and there is no evidence that any of the categories was a factor, let alone a primary factor. Therefore, the trial court's designation of the assaults against Pfeiffer, Patton, and Akemon as hate crimes was in error and that designation is reversed.

We note that, although we have reversed the trial court's designation of three of the assaults as hate crimes, our reversal will have no impact on Burke's sentence. Furthermore, it has no impact on the trial court's denial of probation. The trial court denied probation because it found "imprisonment is necessary for the protection of the public because probation would unduly deprecate the seriousness of the crime, and several of the victims suffered a serious physical injury." Thus, the trial court did not deny probation because of the hate-crime designations. Finally, there is no evidence regarding Burke's parole eligibility, and discussion about the impact of one hate-crime designation versus four hate-crime designations would be impermissibly speculative.

## B. Evidentiary issues.

Burke argues that the trial court made a number of erroneous rulings on evidentiary issues. We review a trial court's decision to admit or exclude evidence for an abuse of discretion, which occurs if a "trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). We address each of Burke's concerns separately.

### 1. Photograph of Burke.

Burke made a motion *in limine* seeking to exclude any photographs that showed his tattoos. In support of his motion, Burke argued that the tattoos, in particular a swastika on his shoulder, would unduly prejudice the jury. The Commonwealth, noting that part of Burke's defense was that he did not assault Meyer, argued that it was necessary to show a photo to witnesses so that they could adequately identify Burke as one of Meyer's assailants. The court held that a photo of Burke could be shown to the witnesses and published to the jury because it was necessary for identification purposes. However, the court held that the jury would not have access to the photo during deliberations, and the court ordered the Commonwealth and its witnesses to refrain from mentioning or pointing out the swastika tattoo.

The Commonwealth showed the photo to the jury for brief periods during its examination of Kohlman, Sprague, and Meyer and no one mentioned or pointed out the swastika tattoo. Burke objected each time the photo was shown, and the court overruled his objections. On appeal, Burke makes a wide-ranging argument regarding use of the photograph indicating that it was irrelevant and that its admission violated Kentucky Rules of Evidence (KRE) 404(a) and (b), and KRE 403. The Court of Appeals found that use of the photograph was not error and, even if error, it was harmless. We agree.

■ Burke's defense to the assault charge involving Meyer was that Searp was her sole assailant. Head shot photographs taken that night show Searp wearing a white sleeveless t-shirt with no visible tattoos and Burke wearing a light gray sleeveless t-shirt with prominent tattoos on his upper arms, shoulders, neck, and face. The Commonwealth's witnesses who testified about the assault of Meyer disagreed as to which of the two men was wearing which t-shirt; however, all of the witnesses agreed that both the non-tattooed man and the heavily tattooed man assaulted Meyer. Therefore, the photograph showing that Burke was heavily tattooed was relevant to his identification.

■ KRE 403 provides that otherwise relevant evidence should be excluded if "its probative value is substantially outweighed by the danger of undue prejudice." The photograph was probative because it tended to prove Burke's identity as one of Meyer's assailants. Although we agree with Burke that a swastika has significant negative connotations, we cannot say that the jury's minimal exposure to the photograph resulted in undue prejudice sufficient to outweigh that probativeness. Therefore, the trial court's order permitting the Commonwealth to use the photograph did not violate KRE 403.

■ KRE 404(a) provides that character evidence is not admissible to prove that a defendant acted "in conformity therewith." It appears that Burke is arguing that the swastika tattoo was inadmissible character evidence. However, Burke admits in his brief that "a swastika does not give rise to an inference of homophobia. A direct inference about what the swastika does 'say' is elusive but generally could infer religious, racial or national origin bias." There was no evidence regarding what Burke believed the swastika represented, and there was no evidence that

Burke's assaults on any of the victims was motivated by religious, racial, or national origin bias. Based on the preceding, it is unclear to us what character trait Burke believes the Commonwealth put into evidence or how he acted in conformity with that trait. Therefore, we discern no violation of KRE 404(a).

As to KRE 404(b), we agree with Burke that evidence of "other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, to the extent the photograph amounted to evidence of "crimes, wrongs, or acts" it was admissible to prove identity, which is why the Commonwealth used the photograph. *See* KRE 404(b)(1). Therefore, we discern no violation of KRE 404(b).

**2. Evidence found in Clark's car.**

■ Clark testified that he got out of the car when everyone else did, and he heard Abney cursing but did not hear Searp, Burke, or Keller yell anything. Things rapidly got chaotic and, according to Clark, everyone was suddenly gone and just as suddenly returned. Clark and his passengers then got back into the car and a white van pulled into the parking lot. Patton jumped out of the van, swinging a hammer, and yelling. Burke and everyone else then got out of the car, but Clark did not see if Burke was hit by anyone or if Burke hit anyone.

When the police arrived, Burke and the others were sitting in Clark's car. Officers got everyone out of the car and called for a drug alert dog. The dog alerted, and officers searched the interior of the car, finding a prescription pill bottle with the name Stacy Crail on it and a green handled knife. Officers then arrested Clark and charged him with possession. During its cross-examination of Clark, the Commonwealth, which had previously questioned

one of the officers regarding the dog, asked Clark about his arrest, the pill bottle, and the green handled knife. Burke objected arguing that the evidence was not relevant. In support of its line of questioning, the Commonwealth argued that Clark's credibility was at issue and the evidence went to his credibility. We note that Clark explained that the pill bottle belonged to a woman he had let drive his car and that the green handled knife was his. We also note that the parties agreed that Burke had not used the green handled knife. On appeal, Burke argues that this evidence, and testimony about the alert dog, "was a blatant violation of KRE 401, 403 and 404(b)."

We agree with Burke that the contested evidence was irrelevant and should not have been admitted. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." KRE 401. The facts that a dog alerted to the presence of drugs in Clark's car, the police found drugs in Clark's car, and the police found a knife that was not involved in the altercations has nothing to do with whether Burke assaulted Meyer or acted in self-defense when stabbing Pfeiffer, Patton, and Akemon.

■ However, admission of that evidence, while error, was harmless. Clark was Burke's witness; but Clark's testimony was not particularly helpful to Burke. Clark testified that he did not see any of the altercations; therefore, he could not state whether Burke assaulted any of the victims, or whether Burke acted in self-defense. Furthermore, Clark testified that Burke had returned to the car before Patton arrived. His testimony that Patton was swinging a hammer and yelling was supportive to Burke's self-defense claim. However, Clark's testimony that Burke got out of the car to confront Patton was not helpful. And, although we are confused as to why the Commonwealth wanted to contest Clark's credibility in light of that testimony, doing so was not harmful to Burke's claim of self-defense.

### 3. Witness addresses.

■ The Commonwealth asked Sprague, Kohlman and Meyer whether they were comfortable telling the jury their addresses. The women stated that they did not want to give their addresses, and Burke objected to the Commonwealth's questions. The trial court overruled Burke's objections finding that the witnesses' unwillingness to give their addresses went to their feelings about the incident, not their feelings about Burke. The Court of Appeals found that any error was harmless.

■ Error is not harmless if it "had substantial influence" on the judgment or if we have "grave doubt" whether the error substantially influenced the judgment. *Crossland v. Commonwealth*, 291 S.W.3d 223, 233 (Ky. 2009)

On appeal, Burke argues that the trial court abused its discretion and that the error was not harmless because the Commonwealth's questions sent a "signal to the jury that these women needed special protection because Burke was dangerous and thus guilty." While we agree that the Commonwealth's questioning could have sent the signal Burke posits, we also agree with the Court of Appeals that it could have simply signaled witness discomfort with the circumstances surrounding the assaults. Furthermore, the questioning was limited and occurred early in the trial. Therefore, we cannot say that it had a substantial influence on the judgment.

Finally, we note that asking the witnesses if they were comfortable giving their street addresses was unnecessary

and irrelevant regarding Burke's guilt. While doing so was harmless here, pursuing such an irrelevant and unnecessary line of questioning might not always be harmless, and the Commonwealth should avoid doing so in the future.

## C. Restriction on right to present a defense.

 As set forth above, Burke questioned Clark on direct and the Commonwealth questioned him on cross. On redirect, Clark testified that he was afraid of Patton because of the hammer and that he thought someone might get hurt. On recross, Clark admitted that, despite his fears, everyone got out of the car to confront Patton. Burke then asked the court for leave to conduct re-re-direct stating he believed Clark's testimony was confusing because Clark had not testified that anyone went after Patton. The court denied Burke's request, stating that he could make that point in closing argument. Burke then asked Clark on avowal if everyone got out of the car to confront Patton. Clark said that they were not going to confront Patton but, "because he was want[ing] to start trouble," they were going to find out what Patton wanted. Furthermore, Clark testified that he had no intention of fighting Patton, although he could not say what the others intended.

Burke argues that the trial court's denial of his request to conduct re-redirect impermissibly limited his ability to effectively present a defense. The Court of Appeals disagreed, as do we.

 KRE 611(a) provides that the trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to: (1) Make the interrogation and presentation effective for the ascertainment of the truth; (2) Avoid needless consumption of time; and (3) Protect witnesses from harassment or undue embarrassment." We review a trial court's exercise of that control for abuse of discretion. *See Mullikan v. Commonwealth*, 341 S.W.3d 99, 104 (Ky. 2011).

As noted above, the trial court permitted both Burke and the Commonwealth two bites at Clark. Before giving Burke a third bite, the court asked him what additional testimony he hoped to obtain from Clark. Based on Burke's response, the court determined the additional testimony was not necessary. Having reviewed the record and noting the analysis undertaken by the trial court, we cannot say that it acted arbitrarily, unreasonably, or unfairly. *See English*, 993 S.W.2d at 945.

 Furthermore, even if the trial court had abused its discretion, testimony that Burke got out of the car because Patton wanted "to start trouble" and Burke wanted to find out what Patton wanted would not have been helpful to his defense. Thus, any error by the trial court was harmless.

## D. Jury instructions.

The parties and the court agreed that Burke was entitled to jury instructions on second degree assault and on the lesser included offense of fourth degree assault as to Patton, Pfeiffer, and Akemon. Because of the perceived difficulty in crafting instructions that would encompass all of the elements, the court and the parties had several discussions regarding jury instructions. The Commonwealth offered a complete set of jury instructions to the court and Burke offered a partial set of jury instructions. Notably, Burke's proffered instructions did not contain any instruction for second degree assault as he apparently agreed with that instruction as proffered by the Commonwealth.

The court essentially adopted the Commonwealth's second degree assault instruction and then crafted its own instruction for fourth degree assault. Following the close of evidence, the court distributed the final version of the jury instructions to the parties. The Commonwealth indicated that it had no objection to the instructions, but Burke, noting that the instructions were different from what had been previously discussed, asked the court for "10 minutes" to review them. The court granted Burke's request, and, after conducting his review, Burke voiced no objection.

The Court of Appeals held that the second degree assault instruction was acceptable, but that the fourth degree assault instruction was not. However, the court determined that the error was not palpable. Burke continues to argue that the second degree assault and the fourth degree assault instructions were faulty. We address each in turn.

**1. Second degree assault instruction.**

 Instruction No. 3, which the trial court referred to as "the road map instruction," generally provided for Patton, Pfeiffer, and Akemon as follows:

1) Under the evidence presented to you in this case, and under Count I [and II or III as appropriate] of the Indictment, you may find the Defendant, Devlin Burke, not guilty, or you may find him guilty of one of the following offenses:

A) Assault in the Second Degree;

OR,

B) Assault in the Fourth Degree, intentional action and mistaken belief of right to self-defense;

OR,

C) Assault in the Fourth Degree, intentional action and no dangerous instrument;

OR,

D) Assault in the Fourth Degree, reckless action and dangerous instrument.

The specific second degree assault instructions read as follows:

You will find the Defendant, Devlin Burke, guilty of the offense of Assault in the Second Degree under this instruction and under Count I of the indictment if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:

A. That in Kenton County on or about August 15, 2010, and before the finding of the indictment herein, the Defendant intentionally caused a physical injury to James Patton [or Pfeiffer or Akemon as appropriate] by stabbing him and/or slicing him with a knife or sharp-edged weapon;

AND,

B. That the knife or sharp-edged weapon was a deadly weapon or dangerous instrument as defined under Instruction No. 4;

AND,

C. That in so doing, he was not privileged to act in self-protection.

You should indicate your verdict on the attached verdict form.

We note that the court provided a general instruction defining self-defense before the initial second-degree assault instruction, but it did not provide a stand-alone imperfect self-defense definition. Rather, the court opted to provide the imperfect self-defense definition within the instructions for fourth-degree assault.

Burke argues that the court should have given the jury the option, within the second-degree assault instruction, to find that he acted with imperfect self-defense. If the jury found imperfect self-defense, it would then have been directed to the fourth-degree assault instruction. That may or may not have been a better way to craft

the second-degree instructions; however, Burke did not offer such an instruction. Furthermore, we agree with the Court of Appeals that the "road map" laid out in Instruction No. 3 sufficiently laid out the options available to the jury. Thus, any error in the second-degree instructions was not palpable.

## 2. Fourth-degree assault instruction.

■ KRS 508.030 states that a person is guilty of fourth-degree assault if he causes physical injury to another person "intentionally or wantonly" or recklessly "by means of a deadly weapon or a dangerous instrument." The fourth-degree assault jury instructions provided that the jury could find Burke guilty if it found that he caused physical injury to Patton, Pfeiffer, or Akemon by "stabbing him and/or slicing him with a sharp-edged weapon." The jury also had to find that Burke:

was acting intentionally;

OR, ... was acting recklessly and the knife or sharp-edged weapon was a deadly weapon or dangerous instrument; AND,

C. That in so doing:

1. He was not privileged to act in self-protection;

OR,

2. Though otherwise privileged to act in self-protection, he was mistaken in his belief that [it] was necessary to use physical force in self-protection, or mistaken in his belief in the degree of force necessary to protect himself; and when Defendant caused the physical injury to another he was aware of and consciously disregarded a substantial and unjustifiable risk that he was mistaken in that belief and that his disregard of that risk constituted a gross deviation from the standard of care that a reasonable person would have observed in the same situation;

OR,

3. Though otherwise privileged to act in self-protection, he was mistaken in his belief that [it] was necessary to use physical force in self-protection, or mistaken in his belief in the degree of force necessary to protect himself; and when Defendant caused the physical injury to another he failed to perceive a substantial and unjustifiable risk that he was mistaken in that belief and that his failure to perceive that risk constituted a gross deviation from the standard of care that a reasonable person would have observed in the same situation; and the knife or sharp-edged weapon was a deadly weapon or dangerous instrument.

Burke argues that this instruction was unclear regarding what mental state the jury was required to find in order to convict Burke of fourth-degree assault. While that may be true, any error was not palpable.

■ "[W]e recognize that an erroneous jury instruction is presumed to be prejudicial[.]" *Harp v. Commonwealth*, 266 S.W.3d 813, 818 (Ky. 2008). However, any error in the fourth-degree assault instruction affected none of Burke's "substantial rights ... and resulted in no manifest injustice." *Id.* Based on our review of this matter, we cannot say that any error had an impact on Burke's substantial rights or resulted in manifest injustice. Kentucky Rule of Criminal Procedure (RCr) 10.26.

■ "The jury is presumed to follow any instruction given to them." *Owens v. Commonwealth*, 329 S.W.3d 307, 315 (Ky. 2011). Here, the jury was instructed in Instruction No. 3, the road-map instruction, that it could convict Burke of either second-degree assault or fourth-degree assault. Furthermore, the fourth-degree assault instructions, which followed each of the second-degree assault instructions, be-

gan as follows: "If you do not find [Burke] guilty of Assault in the Second Degree under [the preceding instruction] you will find [Burke] guilty of Fourth-Degree Assault under this instruction . . . ." Once the jury found Burke guilty of each second-degree assault count, it would have gone to the corresponding fourth-degree assault instruction, read the beginning of the instruction, and moved on. Thus, the jury would not have considered Burke's guilt under the fourth-degree assault instructions because it would not have considered those instructions. Therefore, any error in those instructions could have had no impact on Burke's substantial rights nor could they have resulted in any injustice to Burke, manifest or otherwise.

### 3. Non-unanimous verdict/insufficient evidence pocket knife was deadly weapon/instrument.

Finally, Burke argues that both "the assault second and fourth instructions were fatally flawed because they invited non-unanimous verdicts by combining two theories in one instruction when they were not supported by the evidence." As set forth above, the jury did not consider the fourth-degree assault instruction; therefore, we do not address any additional arguments regarding that instruction. Furthermore, as we previously noted, Burke did not provide the court with a second-degree assault instruction and, after having had the opportunity to review the final jury instructions, raised no objection to the second-degree assault instruction. Thus, any error in the second-degree assault instruction must be palpable to warrant reversal.

The court's second-degree assault instruction stated that the jury should find Burke guilty if:

You believe from the evidence beyond a reasonable doubt, all of the following:

A. That in Kenton County on or about August 15, 2010 . . . [Burke] intentionally caused a physical injury to [the named victim] by stabbing him and/or slicing him with a knife or sharp-edged weapon;

AND,

B. That the knife or sharp-edged weapon was a deadly weapon or dangerous instrument as defined under Instruction No. 4:

AND,

C. That in so doing, he was not privileged to act in self-protection.

As we understand it, Burke is arguing that the second-degree assault instruction is flawed because a knife can be a deadly weapon if it meets certain criteria, but a knife can never be a dangerous instrument because it is listed as a deadly weapon. Furthermore, he argues that his knife did not meet the deadly weapon criteria. Thus, the court's inclusion of the terms "dangerous instrument" and "deadly weapon" in the instructions was error. The Commonwealth characterized this argument as "nonsensical."

KRS 500.080(3) defines dangerous instrument as:

any instrument, including parts of the human body when a serious physical injury is a direct result of the use of that part of the human body, article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury[.]

KRS 500.080(4)(c) defines deadly weapon, in pertinent part, as "[a]ny knife other than an ordinary pocket knife or hunting knife." Instruction No. 4, which the trial

court provided to the jury, contained the essence of those statutory definitions.[3]

■ Given the above definitions, we do not believe the argument is nonsensical; however, it is not persuasive for three reasons. First, the inclusion of knives in the list of deadly weapons does not act to exclude a knife, which is not a deadly weapon, from being a dangerous instrument. A pocket knife or hunting knife, which is not a deadly weapon, is capable of causing death or serious physical injury. Therefore, such a knife can be a dangerous instrument.

Second, the jury instructions proffered by Burke contained a definition of dangerous instrument that is essentially the same as the definition used by the trial court. Burke cannot now claim that the court erred by using his definition or by including the term in its instructions.

■ Third, whether a knife is a deadly weapon or dangerous instrument is an element of the crime, and "the jury must determine every essential element of the crime, including the application of law to fact." *Doneghy v. Commonwealth,* 410 S.W.3d 95, 111 (Ky. 2013). The jury viewed the knife and had ample opportunity to determine if it was a deadly weapon. Furthermore, based on the injuries suffered by Patton, Pfeiffer, and Akemon, the jury could determine that the knife, although not a deadly weapon, was a dangerous instrument. Therefore, we discern no error in the court's inclusion of the knife as either a deadly weapon or dangerous instrument in the second-degree jury instruction.

Finally, we note that Burke states that the second-degree assault instructions were "fatally flawed because they invited

non-unanimous verdicts by combining two theories in one instruction when they were not supported by the evidence." However, other than arguing that the knife could not be a dangerous instrument or a deadly weapon, Burke does not clarify what the unanimity issue is. Therefore, we do not further address it.

## IV. CONCLUSION.

For the foregoing reasons, we affirm the Court of Appeals in part and reverse in part and remand. On remand, the trial court shall revise the judgment to reflect that Burke's second-degree assaults of James Patton, Preston Akemon, and Chris Pfeiffer were not hate crimes. However, the court shall leave intact the hate-crime designation of Burke's fourth-degree assault of Katie Meyer.

All sitting. All concur.

---

**3.** The definition of dangerous instrument properly did not make any reference to any

part of the human body, article, or substance.