# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS
OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR
CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN
UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A
COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG
WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO
THE ACTION.

RENDERED: AUGUST 24, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0152-MR

TAYNANDREE D. REED                                       APPELLANT

V.

ON APPEAL FROM HARDIN CIRCUIT COURT
HONORABLE KELLY MARK EASTON, JUDGE
NO. 20-CR-00434

COMMONWEALTH OF KENTUCKY                        APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

A Hardin County jury convicted Taynandree Reed of two counts of murder and one count of assault in the first degree. Reed was sentenced to seventy (70) years in prison, consistent with the jury's recommendation. This appeal followed as a matter of right. *See* KY. CONST. § 110(2)(b). Having reviewed the record and the arguments of the parties, we affirm the Hardin Circuit Court.

## I. BACKGROUND

On May 13, 2020, Shawn Fox (Shawn), his girlfriend Kenia Thomas (Kenia), and his friend Michael Buckner Thomas (Michael) drove from Henderson, Kentucky to Elizabethtown, Kentucky to meet with Taynandree

Reed (Reed) who was coming to Elizabethtown from Lexington, Kentucky.[1] Shawn had set up this meeting with Reed in order to look at and potentially purchase a used car from Reed. During the drive to Elizabethtown, Michael became nervous, and Kenia gave him her gun, in an attempt to, she said, provide him with some peace of mind. When Shawn, Kenia, and Michael arrived at the Green Hill Apartment complex, the previously agreed-upon meeting location, Reed was already there. Unbeknownst to the threesome but as evidenced by cell phone location data, as well as surveillance video from the apartment complex and area businesses, Reed had been in the area for over forty-five minutes, both walking around and driving his mother's car. Prior to meeting with the three, Reed parked his mother's car approximately a block away from the apartment complex.

Upon arriving at the apartment complex, Shawn exited the car and spoke to Reed. The topic of this conversation is unknown. Shawn and Reed then both got into the car. At this point, Kenia was in the front driver's seat; Shawn was in the front passenger seat; Michael was in the back seat on the driver's side; and Reed was in the back seat on the passenger side. Reed told the others that they needed to wait for his girlfriend to get there because she had the car they were interested in purchasing.

---

[1] We use first names to identify Shawn Fox, Kenia Thomas, and Michael Buckner Thomas to avoid confusion because of the similarity of the last names of Kenia Thomas and Michael Buckner Thomas.

After approximately thirty to forty minutes, Shawn left the car to use the restroom. Upon his return, Kenia began to complain that she was hungry and tired of waiting. About fifteen minutes after Shawn returned and as Shawn and Kenia discussed where to get food, Reed stated that he needed to use the restroom as well. He exited the car and was gone for a couple of minutes. When Reed returned to the car, he opened the back passenger side door. He immediately shot Michael in the head. He then shot Shawn twice—once in the neck and once in the head. As he turned to shoot Kenia, Kenia "scrunched up" her shoulders, causing the bullet to strike her shoulder before ricocheting up, going through her ear, and hitting her head. Kenia was rendered unconscious. Reed remained at the car for several minutes and eventually fled with Kenia's purse and cell phone and one of Shawn's two cell phones.

When Kenia awakened, she was unable to move her legs. She looked around the car but could not find her phone to call for help. She then used her hands to pick up her legs, placing one on the brake pedal and one on the accelerator. She began driving and honking her horn until she found a driveway that she thought would provide safety. She pulled into that driveway, continuing to honk her horn. The resident of that house went outside, immediately saw blood and knew something was wrong. His wife called 911. The first responder on the scene was a police officer who could not detect any signs of life on either Shawn or Michael. He rendered aid to Kenia until medical personnel arrived. While moving Kenia's hair to attempt to find the wound

3

causing her to bleed, a bullet fell from her head. Kenia was brought to the hospital and released the next day.

Police immediately began investigating the shooting. They found a bag with $9000 in cash in the front passenger floorboard near Shawn's feet, which had apparently fallen out of his pants when Kenia drove over a curb after the shooting. They also found Kenia's gun on the back driver's side floorboard. Police obtained surveillance video from the Green Hill Apartment complex and identified the person they believed was the suspect. Police then ran a still photo of that person from the surveillance video through facial recognition software. They received three potential matches, one of which was Reed. By this time, they had already received Shawn's cell phone records. Thereafter, they determined that Reed was the last person that Shawn had contacted on his cell phone.

The police then obtained location data for the cell phones belonging to Kenia, Shawn, and Reed. This location data showed that the three phones were together in the area of the Green Hill Apartments at the time of the shooting. Shortly thereafter, they travelled together along the Bluegrass Parkway towards Lexington. Kenia's phone stopped pinging cell towers around mile marker 7 on the Bluegrass Parkway. Shawn's phone stopped pinging around mile marker 19, and Reed's phone continued to Lexington. Kenia's and Shawn's phones were never recovered. Kenia's purse, however, was found with blood on it, a short distance from the Green Hill Apartments.

4

Just over a week later, Reed was arrested at a Kroger in Versailles, Kentucky. After being placed in handcuffs, he attempted to flee but was quickly apprehended. He was eventually indicted on two counts of murder and one count of assault in the first degree. A Hardin County jury convicted Reed on all counts, and he was sentenced to seventy (70) years in prison. This appeal followed.

## II. ANALYSIS

Reed asserts three claims of error in this appeal. First, he argues that the Commonwealth's Attorney committed prosecutorial misconduct when he repeated allegations of robbery, a crime on which Reed was not indicted, throughout his opening statement and closing argument. Next, he argues that he was entitled to a jury instruction on self-defense. Finally, he argues that the trial court erred in admitting re-call testimony from a Commonwealth's expert witness, as it was confusing and prejudicial. We will address each of these alleged errors in turn.

### A. Commonwealth's Opening Statement and Closing Argument

Reed first argues that the Commonwealth's Attorney committed prosecutorial misconduct when, during both his opening statement and his closing argument, he repeatedly alleged Reed committed a robbery, a crime with which Reed was not charged. Reed acknowledges that this allegation of error is not preserved and requests palpable error review pursuant to Kentucky Rule of Criminal Procedure (RCr) 10.26.

5

During its opening statement, the Commonwealth alleged that the crimes were committed for the purpose of committing a robbery. For example, the Commonwealth stated, "[T]o [Reed] this wasn't a drug deal. To him this was about money. It was about robbery." During its closing argument, the Commonwealth referenced the alleged robbery multiple times including by making statements such as, "[Reed] knew he was going to set up a robbery," and "[Reed]'s setting this robbery up. It's going to be on his terms. Whether it's a car or whether it's drugs, it's on his terms where they are meeting, his turf." Reed, however, was not charged with the offense of robbery. Because he was not charged with that offense, Reed argues that the Commonwealth's repeated references to his commission of a robbery were misleading and inherently prejudicial. He asserts that the Commonwealth's Attorney committed prosecutorial misconduct by making these statements.

"Prosecutorial misconduct is 'a prosecutor's **improper or illegal act** involving an attempt to persuade the jury to wrongly convict a defendant or assess an unjustified punishment.'" *Commonwealth v. McGorman*, 489 S.W.3d 731, 741–42 (Ky. 2016) (emphasis added) (quoting *Noakes v. Commonwealth*, 354 S.W.3d 116, 121 (Ky. 2011)). Any allegation of misconduct must be viewed in the context of the overall fairness of the trial. *Id.* at 742 (citing *St. Clair v. Commonwealth*, 451 S.W.3d 597, 640 (Ky. 2014)). To justify reversal, the Commonwealth's misconduct "must be so serious as to render the entire trial fundamentally unfair." *Soto v. Commonwealth*, 139 S.W.3d 827, 873 (Ky. 2004) (quoting *Stopher v. Commonwealth*, 57 S.W.3d 787, 805 (Ky. 2001)).

6

In determining if the Commonwealth's Attorney acted improperly or illegally in the case at bar, we are mindful that "[o]pening and closing statements are not evidence and wide latitude is allowed in both. . . . Counsel may draw reasonable inferences from the evidence and propound their explanations of the evidence and why the evidence supports their particular theory of the case." *Wheeler v. Commonwealth*, 121 S.W.3d 173, 180–81 (Ky. 2003) (citations omitted). "[T]he fundamental issue is whether the 'statement is reasonably supported by the evidence.'" *Murphy v. Commonwealth*, 509 S.W.3d 34, 54 (Ky. 2017) (quoting *Padgett v. Commonwealth,* 312 S.W.3d 336, 353 (Ky. 2010)).

In this case, the Commonwealth's statements that Reed committed a robbery were reasonably supported by the evidence. Under Kentucky Revised Statute (KRS) 515.020(1),

> [a] person is guilty of robbery in the first degree when, in the course of committing theft, he or she uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he or she:
>
> (a) Causes physical injury to any person who is not a participant in the crime; or
>
> (b) Is armed with a deadly weapon; or
>
> (c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.

Evidence at trial along with reasonable inferences that could be drawn from that evidence showed that Reed was armed with a .380 handgun. It showed that he shot Kenia, Shawn, and Michael with that handgun. It further showed that, as a result of the shooting, Shawn and Michael died and Kenia was

7

injured. It showed that after the shooting, Reed looked around and inside of the car for approximately six minutes. Finally, evidence showed that when Reed fled the scene, he took with him Shawn's cell phone and Kenia's cell phone and purse. Based on that evidence, it was certainly reasonable for the Commonwealth's Attorney to infer that Reed committed a robbery.

We next must determine whether evidence of the alleged robbery was both relevant and not unduly prejudicial. The Commonwealth asserted throughout trial that Reed's motive for committing the shooting was to accomplish a robbery. "We have long held that while motive is rarely an actual element of a crime, it is often relevant to show criminal intent." *White v. Commonwealth,* 178 S.W.3d 470, 478 (Ky. 2005) (citing *Jillson v. Commonwealth,* 461 S.W.2d 542, 544 (Ky. 1970)). Further, we do not require direct testimony of a witness to establish motive. *Id.* at 476. Instead, "we require only that there be a direct connection between the other crimes and the charged crime. This is true even if that connection is the product of a reasonable inference." *Id.* Robbery as the alleged motive for the shooting was relevant in this case to establish that Reed acted intentionally in shooting Kenia, Shawn, and Michael.

Finally, although evidence of an alleged robbery was prejudicial to Reed's case, it was not unduly prejudicial. Evidence is unduly prejudicial if it carries with it a "risk of an emotional response that inflames passions, generates sympathy, or arouses hostility" or a "risk that the evidence will be used for an improper purpose." *Dixon v. Commonwealth,* 149 S.W.3d 426, 431 (Ky. 2004)

8

(citation omitted). The evidence in this case did not carry either of these risks to such an extent that it outweighed the high probative value of the evidence. *See* KRE 403.

Because the Commonwealth's Attorney's allegation that Reed committed a robbery, made both during opening statement and closing argument, was supported by the evidence and because that allegation was both relevant and not unduly prejudicial, we hold that the Commonwealth's Attorney did not commit prosecutorial misconduct.

## B. Self-defense Jury Instruction

Reed next argues that he was entitled to a jury instruction on self-defense. He asserts that he preserved this issue for appellate review by orally requesting an instruction on self-defense. The Commonwealth disagrees and argues that the issue was not preserved and therefore cannot be reviewed.

RCr 9.54(2) states,

> No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction or by motion, or unless the party makes objection before the court instructs the jury, stating specifically the matter to which the party objects and the ground or grounds of the objection.

Reed acknowledges that he did not tender an instruction on self-defense but asserts that he orally requested the instruction. During the discussion about jury instructions, the trial court noted that although Reed's indictment included both intentional and wanton theories of murder, there was no evidence admitted to allow for the court to include wanton murder in the instructions. In relevant part, the trial court stated,

9

The shooting of an individual in the manner that has been shown in this evidence, could not be wanton. It had to be an intentional act or no act at all . . . . [N]o juror could look at that and say that's wanton. . . . It has to be intentional. Who it is that fired the shots is the question.

Defense counsel then responded, "Well, that takes away his self-defense argument." The following exchange between the trial court and defense counsel then occurred.

Trial Court (TC): Self-defense argument? And what argument is that?

Counsel: Well, that could be the motive of the shooter, that it's self-defense.

TC: But your theory is "that's not him."

Counsel: Beg your pardon?

TC: But your theory of defense is "that's not him," right?

Counsel: Yeah. I think I'm entitled to the complicity argument or at least to argue that there was another person there. And there's a difference between whether or not the first shot was intentional or wanton and the next one was intentional. There's that divide.

The trial court then explained again that it did not believe there was any evidence from which a jury could find wanton murder and mentioned that the same was true about self-defense. The Commonwealth then stated that self-defense would not apply because the shooting occurred during the commission of a criminal offense. The trial court then again stated that there was no evidence to support self-defense. Finally, defense counsel, resigned to the trial court's ruling, said, "Thankfully, Your Honor, I may comment on the evidence, hopefully without being stopped too many times."

10

By its plain language, RCr 9.52 places the burden of ensuring his position is "fairly and adequately presented to the trial judge" on the party requesting a particular jury instruction. *See Martin v. Commonwealth*, 409 S.W.3d 340, 345 (Ky. 2013). In this case, Reed's counsel complained that the lack of an instruction on wanton murder eliminated his self-defense argument. He never specifically requested a self-defense instruction or even implied that he wanted the jury to be instructed on self-defense. Because of this, his position was not "fairly and adequately presented to the trial judge," and this issue is not preserved. Therefore, we decline to review it. *Id.* ("RCr 9.54(2) bars palpable error review for unpreserved claims that the trial court erred in the giving or the failure to give a specific instruction.").

## C. Re-call Testimony of Lawrence Pilcher

Finally, Reed argues that the trial court erred in allowing the Commonwealth to re-call Lawrence Pilcher, a firearms and tool marks identification expert from the Kentucky State Police Laboratory, to testify. Reed asserts that Pilcher's testimony on re-call was so confusing that it was unduly prejudicial. Reed preserved this issue by his objection to allowing Pilcher to be re-called.

During the trial, the Commonwealth presented evidence that police had recovered four .380 caliber projectiles that were involved in the shooting. The police also recovered a .380 caliber Taurus handgun from Reed's mother's residence. They also found a photo of a .380 caliber Walther handgun on

11

Reed's phone, but never recovered this gun. Pilcher identified the model of the Walther handgun depicted in the photograph as being from the PK series.

Pilcher examined the recovered projectiles in an attempt to identify the gun from which they were shot. When he was called to testify the first time, Pilcher testified that he was able to determine that the projectiles were not fired from the Taurus handgun found at Reed's mother's residence. He went on to explain that when he receives projectiles but does not have a gun to which he can compare the projectiles, he can enter information about the quantity and measurements of the lanes and grooves found on the projectile into the General Rifling Characteristics Database. This database will then give him a list of manufacturers and models of firearms from which the projectiles could have been fired. He acknowledged that the database is not all-inclusive, in that it does not include all models of firearms. He further acknowledged that there are "a few errors" in the database.

Pilcher then testified that the particular model of Walther handgun shown in the picture on Reed's phone was not on the list of firearms returned from the database. He qualified this answer by again explaining that not every model of firearm is included in the database. He explained that Walther makes a PK series and a PPK series, and that two other Walther firearms from the P series were on the list. He further explained that manufacturers will often use the exact same rifling specifications on multiple models of guns.

After cross-examination, Pilcher was excused and released from his subpoena. The trial court then took a lunch break. Following the lunch break,

12

the Commonwealth moved to re-call Pilcher to clarify his original testimony. The Commonwealth explained that it mistakenly asked Pilcher if the model of firearm shown in the photo was included on the list returned by the database when it meant to ask him if the manufacturer was included on the list. The trial court granted the Commonwealth's motion, over Reed's objection, because it was concerned the jury would be confused without further clarifying testimony.

During his re-call testimony, Pilcher testified that the manufacturer of the gun shown in the photo found on Reed's phone was included on the list of firearms that could have fired the projectiles at issue in the case. He then again explained that not every model of firearm is included in the database and that some models which are not included may have the same rifling characteristics as models that are included. On cross-examination, Pilcher testified that he was not changing any of the answers that he gave during his original testimony.

To begin, we note that the trial "court has a wide discretion in allowing a witness to be recalled." *McQueen v. Commonwealth*, 88 S.W. 1047, 1048 (Ky. 1905). Trial courts are required to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . [m]ake the interrogation and presentation effective for the ascertainment of the truth." KRE 611(a)(1). We review a trial court's exercise of that control for abuse of discretion. *Burke v. Commonwealth*, 506 S.W.3d 307, 321 (Ky. 2016) (citation omitted). We also review a trial court's decision on the admission of

13

evidence for an abuse of discretion. *Clark v. Commonwealth*, 223 S.W.3d 90, 95 (Ky. 2007) (citation omitted). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Goodyear Tire & Rubber Co. v. Thompson*, 11 S.W.3d 575, 581 (Ky. 2000) (citing C*ommonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

Reed's only argument regarding why the trial court erred in allowing Pilcher to be re-called to testify is that Pilcher's testimony on re-call was so confusing that it was unduly prejudicial. Under KRE 402, "[a]ll relevant evidence is admissible," unless it is prohibited by constitution, statute, or our rules. KRE 403 allows relevant evidence to "be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." As explained above, evidence is unduly prejudicial if it carries with it a "risk of an emotional response that inflames passions, generates sympathy, or arouses hostility" or a "risk that the evidence will be used for an improper purpose." *Dixon*, 149 S.W.3d at 431 (citation omitted).

In this case, we see no such risks in Pilcher's re-call testimony. The trial court allowed Pilcher to be re-called in order to clarify his earlier testimony. He did just that, and he explicitly stated that his answers had not changed from his earlier testimony. The trial court did not abuse its discretion in permitting

14

Pilcher to be re-called to testify and did not abuse its discretion in admitting his testimony on re-call.

## III.   CONCLUSION

For the foregoing reasons, we affirm the judgment of the Hardin Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Kayla Danielle Deatherage
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General