# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: OCTOBER 24, 2024
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0113-MR

JEFFREY LAMULE PARADISE                      APPELLANT

V.

ON APPEAL FROM LAUREL CIRCUIT COURT
HONORABLE GREGORY A. LAY, JUDGE
NO. 22-CR-00097

COMMONWEALTH OF KENTUCKY                APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Following a jury trial in the Laurel Circuit Court, Jeffrey Paradise was convicted of the attempted murder of a Kentucky State Police (KSP) trooper and felony fleeing or evading police. The trial court sentenced Paradise to a total of twenty-two years' imprisonment. Paradise now appeals his conviction as a matter of right, alleging errors by the trial court in refusing his motion for funds for his own expert witness, trial errors, a penalty phase error and cumulative error. We affirm.

## I. FACTUAL AND LEGAL BACKGROUND

After KSP Trooper Steve Walker received information that criminal activity was occurring at a house in southern Laurel County, he surveilled it from his marked state police car. It was after dark when he observed vehicles

in the driveway with their lights on. A van driven by Paradise pulled out from the residence and drove past Trooper Walker, who pulled out behind it and noticed that the van's rear license plate was not illuminated. Trooper Walker activated his vehicle's blue lights and siren and attempted to conduct a traffic stop, but Paradise decided to flee, and Trooper Walker pursued him. Paradise drove through a grocery store parking lot attempting to evade Trooper Walker and continued fleeing, reaching speeds in excess of eighty miles per hour before abandoning his van in the parking lot of an apartment complex and fleeing on foot.

When Paradise abandoned his van, he armed himself with two semi-automatic pistols (one a Ruger, the other a Glock), carrying one in each hand. Both pistols had loaded magazines, and both had rounds chambered making them ready to fire with a pull of the trigger.

Paradise ran between two apartment buildings and Trooper Walker, who was wearing his uniform, exited his vehicle to pursue him. At one point while fleeing, Paradise tripped and was illuminated by Trooper Walker's flashlight. When Paradise got up, Trooper Walker turned off his flashlight and, instead of directly following Paradise, he went around the front of a different building in an attempt to cut off Paradise's escape. Once there, Trooper Walker observed Paradise at the corner of the front of another building, squatted down with his back to the wall between two bushes looking to his right in the direction Trooper Walker would have come if he had continued to directly follow

Paradise.  Such positioning would indicate that Paradise had taken a position to ambush him.

Trooper Walker directed his flashlight onto Paradise who then dove behind a nearby bush. Trooper Walker next heard a gunshot and a bullet "whiz by." Trooper Walker returned fire, hitting Paradise who was right in front of a brick wall. Paradise fell to the ground. Trooper Walker observed a pistol still in Paradise's right hand and ordered him to drop it. After a second command, Paradise let go of the pistol, a Ruger semi-automatic, and he was handcuffed. Trooper Walker spotted the Glock on the ground. Trooper Walker called an ambulance for Paradise. Paradise told him that that he thought he was dying and that he hadn't meant to shoot. One bullet casing was recovered from the Paradise's Glock and one was recovered from Trooper Walker's pistol, but no spent bullets were recovered from the scene.

A KSP investigator photographed a "defect" in the brick wall behind where Paradise had been when he was shot. The investigator informed the grand jury that some sort of lead or bullet splash was in that defect. Paradise was indicted by the grand jury on charges of attempted murder and felony fleeing or evading police, first degree.

At trial, Trooper Walker testified about these events. The Commonwealth also called a resident of the apartment complex who testified that he observed a muzzle flash from where Paradise had concealed himself and that the shot Paradise had fired went in his direction which was also in the direction of where Trooper Walker was positioned.

3

A KSP firearms examiner testified that the Glock had been fired at the scene and could not be fired a second time because it was jammed with a misfed round. While the examiner confirmed that if Paradise had mishandled his Glock, it could have discharged accidentally, the examiner clarified that Paradise's finger would have to have been on the trigger when it discharged because the Glock was not a type of pistol susceptible to accidental discharge. The examiner explained there were many other causes for semi-automatic pistols to misfeed a round other than an accidental discharge. Forensic evidence from the KSP crime lab also confirmed that a round had been fired from Paradise's Glock pistol.

At trial, a KSP investigative sergeant (not the investigator who had testified before the grand jury) testified on behalf of the Commonwealth and on direct examination made no mention of the "defect" in the brick of the wall behind Paradise. On cross-examination by Paradise's counsel, the KSP investigator confirmed photographs of the "noticeable defect" which was "a foot and a half off the ground" but testified that he was "unable to determine what caused that" defect.

Paradise's defense strategy involved admitting he fled from Trooper Walker and that the Glock he was holding had fired a round. His defense to the attempted murder charge was that he did not have the requisite intent to commit murder. While Paradise did not testify at trial, his defense counsel advanced his defense through cross-examination of the Commonwealth's witnesses by attempting to establish that: Paradise fell and, in so doing,

4

accidentally fired one of his pistols; the misfeed found in Paradise's Glock could have been caused by the pistol being discharged accidentally; and Paradise did not intend to either shoot at, or to kill, Trooper Walker. At the request of Paradise's counsel, in addition to being instructed on the charge of Criminal Attempt to Commit Murder, the jury was given instructions on the lesser included offense of First-Degree Wanton Endangerment.

The jury rejected Paradise's defense and found him guilty as charged. The jury recommended a sentence of seventeen years for attempted murder and five years for fleeing or evading police to run consecutively for a total of twenty-two years' imprisonment. The trial court sentenced Paradise in accordance with this recommendation.

## II. ANALYSIS

Paradise argues five errors occurred: (1) the trial court improperly denied his request for funding to retain an expert; (2) Trooper Walker's testimony that he was surveilling the house from which Paradise exited was more prejudicial than probative; (3) the Commonwealth was allowed to impermissibly shift the burden of proof during its closing argument; (4) the Commonwealth provided incorrect information to the jury concerning sentence credits during the penalty phase; and (5) cumulative error.

### A. Did the Trial Court Err by Denying Paradise's Pretrial Motion for Funds to Retain an Expert?

Paradise asserts that the trial court committed reversible error when it denied his pretrial motion for expert funds under Kentucky Revised Statutes

5

(KRS) 31.110(1)(b) and KRS 31.185(1). This issue was preserved for our review by Paradise's pre-trial, *ex parte* motion for expert funds. Kentucky Rules of Criminal Procedure (RCr) 9.22. However, Paradise's new arguments on appeal as to why this funding was needed were not presented to the trial court and are not preserved.

We review "a trial court's denial of a defendant's motion for expert funds for abuse of discretion" and adjudge that the "trial court abuses its discretion when it rules in a way that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Daniel v. Commonwealth*, 607 S.W.3d 626, 634 (Ky. 2020).

A defendant's indigence should not serve to deprive him of his due process rights to present a defense. KRS 31.110(1) provides in relevant part: "A needy person . . . who is under formal charge of having committed . . . a serious crime . . . is entitled: . . . to be provided with the necessary services and facilities of representation, *including investigation and other preparation*." (Emphasis added).

KRS 31.185(1) also directs:

> Any defending attorney operating under the provisions of this chapter is entitled to use the same state facilities for the evaluation of evidence as are available to the attorney representing the Commonwealth. If he or she considers their use impractical, the court of competent jurisdiction in which the case is pending may authorize the use of private facilities to be paid for on court order from the special account of the Finance and Administration Cabinet.

6

In *Daniel*, we gave guidance to defendants and trial courts stating the elements to be shown and considered in expert funding decisions, stating:

> Several decades of case law in this area have distilled the test for whether a defendant made a sufficient showing of need for expert funds into the following: "1) whether the request has been pleaded with requisite specificity; and 2) whether funding for the particularized assistance is 'reasonably necessary'; 3) while weighing relevant due process considerations."

607 S.W.3d at 635 (quoting *Benjamin v. Commonwealth*, 266 S.W.3d 775, 789 (Ky. 2008)).

In resolving whether funds should be allocated towards the hiring of such an expert, trial courts must balance their sacred duty to recognize the rights of indigent defendants to have the resources necessary to defend themselves against the concomitant duty to preserve the public's funds and not to dispense funds for unnecessary or frivolous requests. "There is no violation of due process in the refusal to provide for expert witnesses where the defendant offers little more than an undeveloped assertion that the requested assistance would be beneficial." *Simmons v. Commonwealth*, 746 S.W.2d 393, 395 (Ky. 1988).

At the outset of our analysis, we must recognize that the *only* substantive factual issue the jury had to decide was whether Paradise intentionally discharged his firearm intending to kill Trooper Walker and, therefore, an expert witness could only be helpful if that witness could advance such a defense.

7

In Paradise's *ex parte* motion for expert funds, he recited his legal right to funding for an expert due to his indigence, described the amounts of information, evidence and data his counsel had received from KSP, and provided the identity of, and *curriculum vitae* for, his chosen expert as well as the amount of funds necessary to secure such services. He generally stated that, "an independent expert [would] assist in the evaluation and understanding of the work done by the KSP" and "[g]iven the reconstruction work was conducted by the employing agency of Trooper Walker in anticipation of this very litigation and case, it is necessary and proper for the defense to hire its own expert to evaluate the reconstruction work done in this case."

In denying Paradise's motion, the trial court indicated that Paradise had not demonstrated his need for an expert witness given that the crime scene was not complicated, the relative positions of the individuals involved were known, and the discovery from the Commonwealth could adequately be attacked through cross-examination.

As explained in *Davenport v. Commonwealth*, 177 S.W.3d 763, 773 (Ky. 2005):

> Funds will not be provided pursuant to KRS 31.110 so that defense counsel may conduct a "fishing expedition." Rather, defense counsel must provide specific information that he or she expects the expert to provide at trial, and the request should be denied where defense counsel is only able to express the need for an expert in general terms.

We agree with the trial court that Paradise failed to demonstrate his need for an expert witness. Paradise's motion failed to contain any specificity as to

8

"how" the expert's own analysis would have, or potentially could have, assisted Paradise in his defense or contradicted the Commonwealth's proof and failed to identify any opinions or conclusions he wished to challenge or rebut.

Additionally, the evidence accumulated by the KSP was a collection of objective measurements and photographs that could be commonly understood by counsel and laymen and did not require an expert's analysis. At trial, the parties agreed as to the validity of the crime scene information. Accordingly, we hold that Paradise's motion for expert funds made to the trial court was not pleaded with requisite specificity to establish the "reasonable necessity" of such expert's services.

On appeal, Paradise expands and alters the focus of the arguments he made to the trial court. We note that "our review of a trial court's denial of funds pursuant to KRS 31.110 is *limited to the reasons actually presented to the trial court*." *McKinney v. Commonwealth*, 60 S.W.3d 499, 505 (Ky. 2001) (emphasis added). However, we briefly discuss his additional arguments to explain why even if they had been presented to the trial court, they would not require a different result.

Paradise reiterates his "accidental discharge" defense and argues his chosen expert was necessary to "evaluate the reconstruction work done in this case" because of the amount of material the KSP generated in its crime scene reconstruction investigation which included "hundreds of photographs," drone footage, bodycam footage, and a 3-D forensic diagram. According to Paradise, an expert was necessary to help his counsel "understand the reconstruction

9

done by the Kentucky State Police, as well as potentially refute it and testify as to a contrary opinion."

In particular, Paradise argues in his brief that an expert was necessary because the resident who witnessed the shooting and testified that Paradise discharged his weapon in Trooper Walker's direction, "could have been impeached through a careful examination of the crime scene reconstruction by the defense expert." In his reply brief, Paradise additionally intimates that an expert could have helped him to establish that the wall defect was caused by the bullet fired from Paradise's pistol, thus disproving that he purposefully fired at Trooper Walker.

Such an assertion is highly speculative and not supported by the available evidence that Paradise had before trial, or any evidence adduced at trial. Despite a thorough investigation, the bullet fired by Paradise was never recovered and no bullet damage from that round was testified to at trial. The grand jury testimony that the defect was caused by a bullet is most logically linked to the bullet fired by Trooper Walker which "passed all the way through [Paradise]" as testified to by Paradise's treating surgeon. Based on the agreed placement of Paradise at the scene, this bullet would have exited in the direction of that wall. Without any evidence to support Paradise's theory that the defect was instead caused by him somehow firing away from the trooper in contravention of all the evidence presented at trial, we cannot conclude that the expert could have reasonably come to such a conclusion and thereby aided his defense.

10

Ultimately, we conclude that neither the arguments presented to the trial court or on appeal could establish that expert funding was required, or if provided would have aided in establishing Paradise's defense. Therefore, the trial court did not abuse its discretion in failing to grant his motion.

**B.     Did the Trial Court Commit Reversible Error by Allowing Testimony Regarding Police Surveillance of the Area Where Paradise was First Observed? – Preserved.**

Paradise filed a pretrial motion *in limine* regarding the potentiality that "evidence will be admitted at trial regarding Mr. Paradise being involved in drug activity" because "Trooper Walker was surveilling a house in North Corbin for drug activity based on an anonymous tip. . . ." Paradise noted he was not charged with any drug crimes and Trooper Walker did not attempt to pull him over because of drugs but because his license plate was not illuminated. Paradise asked that testimony be limited to the fact that Trooper Walker spotted Mr. Paradise without his rear license plate illuminated and attempted to pull him over for that. Paradise's concern was that there not be any prejudicial implication that he was at the surveilled house using or dealing drugs.

The trial court resolved:

My ruling is that the officer will be permitted to very briefly, can't be dwelt on, can't be details given, of explaining why he was there based upon the complaint. And I agree with you that there can be no imputation that apparently the defendant was not necessarily a suspect or anything. But I will permit the officer to, on that limited basis, explain why he was there and what he was doing. That's my ruling.

During his direct testimony, Trooper Walker stated:

11

I had received information about some criminal activity around the Haynes Baker Road, in that area. I was conducting... I went to that area after I came out to work. I came out at eight o'clock and got down there about nine-thirty-ish and I set up surveillance on this location to see what I could see. When I arrived, there was a vehicle in the driveway with the lights on. I was... I didn't have binoculars with me at that time, and I really couldn't tell what kind of vehicle because it was dark up there and just had the lights on the vehicle.

. . .

Then the van, which Mr. Paradise was driving, backed out, and it came down the road toward my location. So, he passed me where I was parked and drove up to the intersection of US 25 and stopped. I drove up out behind him and observed that his license plate light wasn't illuminated.

During cross-examination, Paradise's counsel attempted to question the legitimacy of Trooper Walker's pursuit of Paradise for a simple non-illumination of his license-plate. On redirect, the Commonwealth asked if any other factor was considered in pursuing Paradise. Trooper Walker answered that Paradise came from an area that was under surveillance for criminal activity. There were no contemporaneous objections to any of this testimony and no requests for an admonition.

While Trooper Walker did "thread the needle" as instructed by the trial court and not mention drug-related activity or Paradise being either a suspect or the focus of the surveillance, Paradise argues on appeal that the testimony still put Paradise at a home that was under surveillance and was not relevant under Kentucky Rules of Evidence (KRE) 402 to prove the elements of the crimes of murder or fleeing or evading. He further asserts that this testimony

12

should have been excluded under KRE 403 because its probative value was substantially outweighed by the prejudice to Mr. Paradise since his presence at a location being surveilled by the police implied wrongdoing on his part which was character evidence not permitted by KRE 404 which is meant to be "exclusionary in nature." *Clark v. Commonwealth*, 223 S.W.2d 90, 96 (Ky. 2007).

We review the trial court's decision to admit such evidence for abuse of discretion. *Burke v. Commonwealth*, 506 S.W.3d 307, 318 (Ky. 2016).

KRE 404(b), which concerns character evidence regarding "other crimes, wrongs, or acts[,]" provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:
>
> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
>
> (2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

Of note, "the list provided in KRE 404(b)(1) is illustrative rather than exhaustive." *Kelly v. Commonwealth*, 655 S.W.3d 154, 165 (Ky. 2022). It is usually fairly easy to determine whether evidence is relevant and probative. Typically, the more challenging part of this evaluation is weighing "the prejudicial nature of the 'other bad acts' evidence versus its probative value." *Leach v. Commonwealth*, 571 S.W.3d 550, 554 (Ky. 2019).

13

To determine the admissibility of "bad act evidence," we have adopted the three-prong test described in *Bell v. Commonwealth*, 875 S.W.2d 882, 889–891 (Ky. 1994), which evaluates the proposed evidence in terms of: (1) relevance, (2) probativeness, and (3) its prejudicial effect.

KRE 404(b) would be applicable if the evidence of "criminal activity" was introduced with the intention of showing that Paradise was acting in conformity with his character to commit one bad action (being in proximity to unspecified crimes) when the charged bad acts (either attempted murder or fleeing or evading) occurred (*i.e.* "prove the character of a person in order to show action in conformity therewith"). *Kentucky Farm Bureau Mutual Insurance Company v. Rogers*, 179 S.W.3d 815, 819 (Ky. 2005). However, this is not actually what occurred in this prosecution.

First, Trooper Walker's testimony as given did not directly, or necessarily, impugn Paradise with "other bad acts" since he neither accused Paradise of being a party that was under surveillance or that he was a suspect in any criminal-related activity. In sum, Trooper Walker's testimony did not tie Paradise personally to any alleged criminal acts, the prejudicial effect of the limited testimony would have been negligible, and such "bad acts" evidence would still be properly admissible so long as it was not "*unduly* prejudicial because it is not unnecessary or unreasonable." *Luna v. Commonwealth*, 460 S.W.3d 851, 873 (Ky. 2015) (footnote omitted). Second, Paradise opened the door to the minor comment made in contravention of the trial court's limitation through his cross-examination question.

14

Given the circumstances of this case, we cannot say that the trial court's ruling on Paradise's motion *in limine* was in error or that the limited testimony the trial court allowed constituted an abuse of discretion. Additionally, the evidence of Paradise's guilt was overwhelming. Therefore, we reject the inference that the limited testimony given by Trooper Walker regarding the reason for his presence in the area had any influence, substantial or otherwise, on the jury's ultimate determination.

**C. Did the Commonwealth's Statements During its Closing Argument Impermissibly Shift the Burden of Proof? – Preserved.**

Paradise asserts that the Commonwealth made an improper "burden shifting" argument during its closing when the Commonwealth stated, "[p]ut them [Paradise and his counsel] to the test." Paradise's counsel objected and at the bench conference the Commonwealth informed the trial court that this statement was directed towards countering the defense's argument that the Commonwealth was asking the jury to make assumptions. The trial court ruled that "simply comparing arguments is not burden shifting." Paradise did not request a mistrial or a jury admonishment. No further objections were made to the Commonwealth's closing argument.

On appeal, Paradise argues that the Commonwealth's statement was misconduct, an improper shift of the burden of proof, and a violation of his right to a presumption of innocence.

The full context of this allegedly improper statement was found in a section of the Commonwealth's closing where it was stated:

15

I'm going to remind you of a couple things they said in the opening argument. "This case is about assumptions." That is what they said. I've made no assumption in this case, nor do I ask you to assume anything. None. I ask you to look at the evidence, the testimony that's been presented to you yesterday, and that alone. They also said, "He's grossly over charged." He is properly charged because he has done everything that he has been charged with. So, I ask you to go back and ask what assumptions have I asked you all to make. Put them to the test.

In response to Paradise's argument, the Commonwealth asserts that it was allowed to challenge the defense position arguing that Paradise only accidentally fired one of his pistols and that the Commonwealth was asking the jury to make assumptions, reasoning under such circumstances the Commonwealth could properly "ask the jury to put that argument to the test."

When looking at allegations of prosecutorial misconduct during closing arguments we do so considering the closing argument "as a whole." *Goncalves v. Commonwealth*, 404 S.W.3d 180, 194 (Ky. 2013). Prosecutors have wide latitude in delivering closing arguments and are free to draw any and all reasonable inferences from the evidence. *Murphy v. Commonwealth*, 509 S.W.3d 34, 50 (Ky. 2017). The Commonwealth is permitted to comment on tactics, evidence, and the falsity of the defense position. *Dickerson v. Commonwealth*, 485 S.W.3d 310, 332 (Ky. 2016). "While the prosecutor has a duty to confine his or her argument to the facts in evidence, the prosecutor is entitled to draw reasonable inferences from the evidence, make reasonable comment upon the evidence and make a reasonable argument in response to matters brought up by the defendant." *Driver v. Commonwealth*, 361 S.W.3d 877, 889 (Ky. 2012).

16

However, it is all too important to note that prosecutors have *no such latitude* to "shift the burden of proof" or "contravene the presumption of innocence" during closing arguments. *See* KRS 500.070; *Tamme v. Commonwealth*, 973 S.W.2d 13, 38–39 (Ky. 1998); *Grundy v. Commonwealth*, 25 S.W.3d 76, 82 (Ky. 2000). "[T]he presumption of innocence mandates the burden of proof and production fall on the Commonwealth, any burden shifting to a defendant in a criminal trial would be unjust." *Butcher v. Commonwealth*, 96 S.W.3d 3, 10 (Ky. 2002). "Every person accused of committing a crime is entitled to the presumption of innocence and to have such presumption continue until guilt is proved beyond a reasonable doubt." *Newkirk*, 937 S.W.2d at 695.

Prosecutors must be cautious when offering their own commentary on the defense's proof or arguments. When there is some question over whether the Commonwealth's comments could be interpreted as shifting the burden of proof to the defendant, the trial court should carefully consider whether an admonishment, even if not requested, ought to be given.

The Commonwealth's problematic statement was isolated and subject to various appropriate interpretations. Additionally, the jury was informed at the beginning of trial that the parties' respective opening statements and closing arguments were not evidence, was properly instructed that the Commonwealth had the burden of proof, the jury instructions specifically stated that Paradise was presumed innocent and must be found "not guilty unless you are satisfied from the evidence alone, and beyond a reasonable doubt that he is guilty." *See*

17

*Kirk v. King,* 6 S.W.3d 823, 828-29 (Ky. 1999) (explaining accurate written instructions placing the burden of proof on the Commonwealth "cured any prejudice attributable to the [erroneous] remarks to the jury, especially in light of the fact that the Appellant did not request any other relief"). Therefore, we conclude that even if an error occurred on the part of the trial court in failing to *sua sponte* admonish the jury, it was harmless and did not affect the jury's determination.

**D.  Did the Commonwealth Present Legally Incorrect Information to the Jury Regarding the Time Paradise Would Serve During the Penalty Phase of the Trial? – Unpreserved.**

Paradise also argues that the Commonwealth elicited material misinformation from a Probation and Parole officer during the sentencing phase in violation of Paradis's due process rights citing to *Robinson v. Commonwealth,* S.W.3d 30, 38 (Ky. 2005). Paradise asserts that the probation officer's testimony regarding the statutory credits Paradise would receive was incorrect because Paradise's attempted-murder offense was a violent crime under KRS 439.3401.

Paradise acknowledges that no contemporaneous objection was made and therefore this alleged error is unpreserved. However, Paradise requests palpable error review under RCr 10.26 because the error affected the fairness and integrity of the sentencing phase rendering it "shocking or jurisprudentially intolerable." *Martin v. Commonwealth,* 207 S.W.3d 1, 4 (Ky. 2006).

18

Paradise cites to this specific portion of the questioning where the Parole Officer testified:

> There are various credits you can earn while you're serving a sentence. We have meritorious good time as well as educational credits that you can earn. There's statutory credits that he'll be given simply for the fact that he's serving by state statute. He'll receive those. He can receive work credit if he's given the opportunity to perform a service in the institution.

Paradise argues the Parole Officer's testimony did not accurately reflect the law by making a factual representation that Mr. Paradise "would absolutely receive statutory good time credits and was entitled to them as a matter of law." According to Paradise, the officer incorrectly testified that Paradise could earn good time credits under KRS 439.3401. Additionally, Paradise argues that the officer incorrectly indicated that despite identifying Paradise as a violent offender which makes him ineligible for statutory work time credits, Paradise could earn work time credit when under KRS 197.047(6)(b) violent offenders are not eligible for work time credits. Paradise alleges this false testimony led the jury to believe that Paradise would earn significantly more sentence credits than those to which he may be entitled and "this Court can have no confidence that such belief did not affect the sentence given by the jury."

A look at the entirety of the parole officer's testimony undermines Paradise's concerns.

| Commonwealth: | Is the parole eligibility the same for the Class D felony, fleeing or evading and for the Class B felony, criminal attempt to commit murder? |
|---|---|
| Parole Officer: | No. It will involve two different percentages. The Class B will, because it involves a police officer, |

19

will be at eighty-five percent and the Class D will be at twenty percent.

. . .

Commonwealth:   Now, the criminal attempt to murder is a violent offense, is that correct?

Parole Officer:   Yes.

Commonwealth:   Okay, so he is restricted from getting some credits until he serves the eighty-five percent?

Parole Officer:   Yes.

Commonwealth:   And, can you tell the jury what I mean by credits? What am I talking about?

Parole Officer:   There are various credits that you can earn while you're serving a sentence. We have meritorious good time as well as educational credits that you can earn. There's statutory credits that he'll be given simply for the fact that he's serving by state statute. He'll receive those. He can receive work credit, you know, if he's given the opportunity to perform a service in the institution. There's lots of credits they can earn.

Commonwealth:   Which reduces their sentence?

Parole Officer:   Yes, sir.

Commonwealth:   But his are restricted until he gets to the eighty-five percent of service, is that correct?

Parole Officer:   That's my understanding.

KRS 439.3401(4) states, "A violent offender shall not be awarded *any*

credit on his sentence authorized by KRS 197.045(1)(b).[1] In no event shall a

violent offender be given credit on his or her sentence if the credit reduces the

---

[1] KRS 197.045(1)(b)1 concerns what are referred to as "good time" credits.

20

term of imprisonment to less than eighty-five percent (85%) of the sentence." (Emphasis added).

The legal effect of this statute is that a violent offender may not earn or accumulate "good time" credits and, while he may earn other types of sentence credits as described in KRS 197.045(1), those credits cannot reduce the length of his imprisonment below eighty-five percent of his sentence.

It appears that the Parole Officer's usage of the pronouns "you" in that portion of the testimony cited by Paradise referred to inmates in general who can earn "good time" credits, not Paradise in particular, and was in response to the Commonwealth's questioning regarding sentence credits overall.

However, any implication, even accidental, that Paradise would receive what was termed as "meritorious good time" or "statutory" credits was in error. Commonwealth's attorneys and parole officers must be vigilant during sentencing and only accurately state the effects, and potential effects, of our statutory credits system on those convicted of crimes. Both parties to this exchange should have known exactly what credits Paradise could earn under the circumstances of his convictions and only discussed those applicable categories.

While this testimony was in error, in this instance it was harmless. Any fear of confusion on the part of the jury is abated by the Commonwealth's specific questioning which occurred immediately before and after this cited portion of the Parole Officer's testimony, which specified that Paradise himself was "restricted" from earning credits until he had served eighty-five percent of

21

his sentence. Overall, the testimony correctly and satisfactorily informed the jury that Paradise would serve no less than eighty-five percent of any sentence imposed by the jury for his violent offender sentence and any credits would not diminish that part of his sentence.

We cannot conclude that Paradise has met the required showing of a "probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law" and we cannot find an error that can be considered "shocking or jurisdictionally intolerable." *Martin v. Commonwealth*, 207 S.W.3d 1, 3–4 (Ky. 2006).

**E.    Did Cumulative Error Render the Trial Fundamentally Unfair?**

For his last argument, Paradise argues that when considering the alleged errors cumulatively, reversal is required. Cumulative error warrants reversal if the trial errors that occurred served to make the trial "fundamentally unfair." *Mason v. Commonwealth*, 559 S.W.3d 337, 345 (Ky. 2018). "We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial." *Brown v. Commonwealth*, 313 S.W.3d 577, 631 (Ky. 2010).

We are confident that the errors this Court has identified did not render his trial fundamentally unfair and, in the cumulative, were harmless. Paradise had the right to a fair trial, not a perfect one. *McDonald v. Commonwealth*, 554 S.W.2d 84, 86 (Ky. 1977). As to his guilt, the evidence against Paradise was overwhelming and jury could readily infer Paradise's intent "from the act itself or from the circumstances surrounding it." *Talbott v. Commonwealth*, 968

22

S.W.2d 76, 86 (Ky. 1998). Paradise was also "presumed to intend all logical and probable results of his conduct," and his intent can be inferred from his actions preceding the actual shooting which included arming himself with two loaded pistols and then concealing himself while lying in wait to ambush Trooper Walker. *Stopher v. Commonwealth*, 57 S.W.3d 787, 802 (Ky. 2001).

## III. CONCLUSION

Accordingly, we affirm Paradise's convictions and sentence by the Laurel Circuit Court.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Aaron Reed Baker
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell M. Coleman
Attorney General of Kentucky

Joseph A. Beckett
Assistant Attorney General